The issues that I'd like to address at this time are the related issues having to do with the thrust of the essential defense in the case, the restriction of that defense by the district court, and essentially the exploitation of that by government during argument. There's two areas of restriction, the primary one related to the heart of the defense itself. The point I think that needs to be emphasized somewhat at this juncture is that the trial court, the district court, allowed the defendant to present the defense that he was unaware of the presence of the cocaine in the truck and that he had acted as an informant in the past. And that there were people who knew it. Having gotten that far, it would seem that the balance of the defense which made it, put it in a context both temporarily and in terms of expected reprisals or the possibility of reprisals and the nature of those reprisals, that's what was excluded. Once one jumps the initial hurdle of the admissibility of the fact that he had acted as an informant at some point in the past and that there were people who knew it, it's difficult to fathom, at least from appellant's standpoint, the restriction of the evidence that would have made it particularly relevant and particularly important as it bore on the facts of the case here. What was excluded more particularly was that appellant had, in 1999, provided information in a forfeiture proceeding that led to a million dollars worth of forfeiture on a person named Miguel Farias who was apparently involved heavily in some organization delivering cocaine from south of the border. There was also evidence that was excluded as part of what had been proffered. And the defense was prepared to present it at the time of trial, indicating that during the course of the proceedings on the forfeiture, appellant had testified at the deposition that his name as a person providing information had been disclosed to counsel for the other side, meaning counsel for Farias, which would have inferably meant that Farias, of course, was not involved. He, of course, knew about it. And the defendant thereafter received a series of threats, which took him up, as I recall, the proffer all the way up within about five months of the incident requested in this case. Can you tell me where the excerpt, the proffer is? If I may, I'll have to grab that. There's two places. I'm not sure I can put my finger on the excerpt portion of this immediately. One is before Judge Moskowitz, there was a session which was a sealed transcript which has been reproduced and is part of, I think, the supplemental excerpts. There is also a – and if I can have just a second here, I can pull this real quickly. There was a long proffer that was made in front of Judge Lorenz once we had been sent out for trial to Judge Lorenz. And I believe it would be the excerpts at 272 to 284. I'm taking this from the brief. I'm not looking at the excerpts right now as I speak. Okay. Thank you. But I believe it would be in there. And 288 to 290. There was an extensive proffer that was made by the defense at the very beginning of trial, which included these basic facts. And you did it at 327 to 58 also. Thank you very much, Your Honor. I appreciate that. In any event, it was made, I think, abundantly clear what evidence the defendants – the appellant had and that we were prepared to present it during the course of the trial. We had, amongst other things, the attorney general from Arizona who had handled the forfeiture proceedings who was prepared to come and testify until such time as Judge Lorenz had ruled inadmissible. Well, the district court said, look, of course you can put on pointing to other people defenses. And that's why I'd let you bring in what you did. In other words, you could point to the guys who sold in the truck and such and say they set me up. It's – that's all there is to it. It seemed to me that the court said, look, there's got to be an end to the chain someplace. You've got to give me some connection, anything. Just give me something that connects various incidents to this incident, anything at all. Now, one thing you said, well, look at that stuff that's sealed. Maybe it's there. But I think that's where the whole thing broke down. The question is, what's wrong with the court saying, you know, well, yeah, you did do something, for example, 20 years ago, and the guy threatened you. Now, I know that's not the least bad. But it's just my way of saying, you know, there's some point at which you say, I want something that makes a connection. And I – if I may, there – there – because of this. Kennedy. So what is the connection? Carvin. Okay. Here's the connection. And it's certainly –  Why don't we just, you know, come right to the point? Carvin. I will come directly. Kennedy. Okay. Carvin. The connection is circumstantial, and it can't ever be better than that. There is no way that an appellant, that a defendant in this – the position of appellant is likely to be able to come up with a witness who's going to say that person X is the person who set him up. The defendant's testimony was that he hadn't been aware of the presence of the contraband in the vehicle, that he had been an informant. And had he been allowed to, he could have explained the circumstances and the context of how recently he'd been an informant, that there had been threats, that there was a real good circumstantial case to be made. And it is circumstantial. But a good circumstantial case to be made that if there was somebody who had a motive to set him up and the capacity – and if I can explain it this way. What was the value of the contraband here? Well, that's an interesting point because it's not – Well, just tell me the value. Looking at it from one standpoint, it's $126,000. Looking at it from another standpoint, it's $900,000. The reality is it's probably somewhere about $100,000 to $125,000 based on the testimony of the government's expert at trial. So your argument is that Farias wanted to get even with your client, So he set him up to be busted with contraband worth several hundred thousand dollars. Well, several hundred thousand dollars, probably not. There's a lot cheaper ways to get retribution, isn't there? Only with great risk. And if I may, let me know. And a highly sophisticated conveyance. Well, I know about the extra kilo. Well, it's not just that. A highly sophisticated conveyance holding most of that. If I could be permitted to make one, what I think is a pretty salient point here. The government argued, and it's one of the points of contention here, exactly what we contended they were probably going to argue when we were arguing about how much cross-examination the defense was going to get on the expert witness. They argued that, gee, $900,000. Who's going to throw away $900,000 just to get this guy? The answer to that is twofold. One, the wholesale value of those drugs on the south side of the border was more like $5,500 per kilo, which added up to about $125. Isn't the other problem here that the other reason this is quite far-fetched is that since you have no basis, I gather, for believing that there was any tip-off or any other reason to think this guy was going to get caught, in particular, it was a completely speculative setup as well. It is not. And that has to do with the placement of the extra kilo outside of the protected area. But there was something I'd like to return to for just a second. It has to do with this notion of loss of value. The government's expert witness testified that the loss wouldn't necessarily be borne by the FARIAS organization in any event, that if it appeared as though it was a law enforcement seizure, they might not be held economically responsible for it unless they were, in some sense, at fault. And if that's the case, he could have risked that much drugs with a virtual certainty that it was going to be seized without necessarily taking any loss himself. And in the world of crooks, they were at fault. All somebody had to find out was what they had done, correct? Well, yes. But one would assume that they were hoping that nobody would ever find out. And the other says, I've heard a lot of stories in my life. This comes pretty close to the top. You know, you know, I mean, we're listening. OK, well, let me let me. The difficulty is one of the one of the things you wanted to cross examine the government agents, as I recall, to have him say, yes, FARIAS actually operates in this particular area. And of course, you know, that's beyond the direct. But I don't recall that anybody was ever called to say that was somebody. I attempted to recall that same witness as my own witness right after the government arrested. And that was denied as well. So the answer is I attempted to put on exactly that evidence. There were basically two forms of objection. One is that it was irrelevant. The other was that it was beyond the scope. To sidestep the question of being beyond the scope, we attempted to recall the witness as our first witness, basically, right after the government arrested and right after the Rule 29 motion was denied. And what did you want to ask him? Pardon me? What did you want to ask him? He testified to his expertise as to organizations in the Tijuana area. And we wanted to examine as to whether or not the FARIAS organization was operating down there and also some questions having to do with the bearing of loss and the nature of that organization. The other thing — That was the same issue. All right. To me, the most troublesome and interesting part of this case is the prosecutor's statement and closing argument with regard to the timing of any informant activity when the prosecutor knew otherwise. Now, you're not exactly alleging prosecutorial misconduct. What is your argument? My argument is twofold. And although I couched it somewhat delicately, yes, I am arguing prosecutorial misconduct. I've couched it as delicately as I could, but it boils down to that. The government attempted to exploit the fact that they'd gotten a ruling that restricted the defense that could be put on. And specifically, that which would make the appellant's position meaningful would be the recency of his information given against Miguel FARIAS and the possibility that FARIAS had acted to set him up directly or indirectly. The government, having obtained the ruling that the defendant could only testify that he had been an informant in 1995 and could not testify, not even the defendant could testify, that he had provided information in 1999 which generated threats   But the fact that the defendant had testified in 1999 and had not testified through 1999 and 2000. Now, did you object at the time to that statement? Yes. Was an instruction given? No. As a matter of fact, I think I objected. I have to double-check it. But I think I objected both times to the comment and requested that there be an instruction given to the jury that that inference was an incorrect inference and to provide the context of it, and the Court declined it. I did request a curative instruction of some form or another, and it was declined by the Court. And what the effect of it was, of course, was to exploit a ruling and make a false inference, basically. The government now concedes that it was error to make that argument, but suggests that it wasn't prejudicial. The problem is that what the government relies on to show that it's not prejudicial involves two areas that are themselves not supported by the record. One is the notion that this is impossible because it's $900,000 worth of drugs, but that's fallacious because it wasn't $900,000 worth of drugs to the people who were involved. Secondly, their own expert testified that 23 kilos would have been a fraction of a small portion of a much larger shipment and wouldn't have been particularly amicable. The argument to be made from that is it wouldn't have been particularly significant to the people who were standing to lose it if they really had it in for repellent sufficiently. But the government then turned around and took the lack of that evidence and suggested that the lack of the evidence that they managed to get the Court to exclude showed the implausibility of the defense. And we have contended that that was improper comment. We contended it at the time, and we continue to contend that. And did the judge ever explain his ruling in that regard? Pardon me? Did the judge ever explain his ruling in that regard? Not in detail. No. Not that I recall. Those, unless there's further questions, those are really all the comments I have, except for one last comment that I'd like to make. The Court has suggested in some of its comments that the appellant's defense was, you know, a tough road to hoe. I don't know what phrase we want to use for it. But it seems to me that that was a jury question. And for the Court, that is the trial court, to allow the defense to be put on that the defendant, A, didn't know that the drugs were there, and B, had been an informant in the past and there were people who knew about it. And then to restrict the scope of the evidence he could put on in that regard, the recency of the information he gave, the fact that there were specific people who knew that he'd given information, that those specific people had made threats. It seems to me that the district court ruling would have been perhaps more logical had it ruled the entire subject off-limits. But to rule it half on-limits and half off-limits, and then to allow the government to exploit the lack of further development in the area, I think was error on a significant constitutional proportion, as contended in our briefs. So I'll reserve whatever time I have left for rebuttal, if that's acceptable. Kennedy. Thank you. You have about four minutes left. Thank you. Thank you. May it please the Court. My name is Blair Perez. I represent the appellee in the United States. I'd like to address first the issue of the government's statements. As I mentioned in my written brief, the government acknowledges that the statements that were made in closing argument were in fact inappropriate. Yeah, but the problem is, and it's really very disturbing, because I've been in this court now, I guess, a little over three years, and I think I've had three cases like this, in which the government first argues vigorously to get some evidence out, and then represents that the evidence that it vigorously argued to get out, which represents the facts regarding it in closing argument. Now, how are we going to – I mean, you had the grace, and I commend you for it, but what are we going to do about preventing this from happening over and over again? Why was it done in the first place? Well, Your Honor, I think I can answer that with the following. One is, in reviewing the evidence as I was preparing for my reply brief, my answering brief, I tried to reconstruct what had happened. You know, I did not only think at the time that it was appropriate, but I thought so when I was even justifying it later when there was a motion for a mistrial trial and I was trying to explain based on the doctrine of invited response that I was justified in making those responses. My mindset at the time, because it had been very, very strongly contested, was that the 1999 deposition did not amount to cooperation or was not a continuation of the informant period because the defendant had to be compelled to testify. He was exceedingly reluctant. Not only did we describe his reluctance, but in the very proffer that the Court was asking defense counsel about, the proffer that can be found at excerpt of Record 334, I think, or 370, even the defense counsel acknowledges that that period of that 1999 deposition, his client was extremely reticent and had to be compelled. The government's interpretation of that upon reading that deposition is that even if we don't know, but even if Mr. Farias had received a copy of that, it was not necessarily going to be interpreted as someone who was cooperating against him. Our characterization of that was not that it was cooperation. With that mindset, I was referring in my closing arguments to the informant period that ended in 1995. That is without dispute that that, in fact, happened. I did not appreciate that the defense's characterization of that 1999 deposition was such that the statements I made to the jury would be misleading, construed as misleading. Obviously, the defense would have argued that that 1999 deposition continued his cooperation, and therefore, my references to stale motive were misleading to the jury. I see and I saw, as I was writing my answering brief, that that, in fact, was accurate. But at the time, during the rebuttal, I thought I was commenting on the state of the evidence based on a firm belief by the government, which I think the record is replete with our efforts in describing and characterizing that as not being cooperation. The judge's rulings were reserved, actually. He – there were objections. He reserved the ruling to the end of argument, and then he found that there wasn't an error, and he decided not to instruct the jury. That is what happened at that time. And all I can say when you ask, what do we do about this to prevent it, is I know that under the Kajian case, you know, the court was trying to fashion a remedy for this – for that particular offense. And that was more egregious, but nevertheless, the court's concern was very much about how do we prevent the United States attorneys from making these statements and just saying, oops, I slipped. It was, you know, in the heat of a rebuttal, because it's very important that we don't do that. And we take these statements that we make in closing argument very seriously. And they looked at three things. One was the government's willfulness in making the statements. And again, I just mentioned to you and explained where my frame of mind and state of mind was at the time that I made those comments. But I would also like for the Court to consider, when they look at this willfulness issue, that the government, from the very beginning, was very much about helping the defendant find out whether or not this was a legitimate defense. We were very interested in providing discovery. The record is – well, the record shows that we had continuances in order to afford the government an opportunity to go to the DEA agent in Riverside to acquire the hundreds of pages of DEA reports that were – that we thought may be relevant. That we got the information from the assistant attorney general in Arizona. And we had the six videotapes of his comments. I mean, we provided everything we could get our hands on, because we, too, were very interested, once we knew that he had, in fact, been a formal cooperator, in finding out whether or not there really was some possibility of a setup. But what we found, after giving them everything that we had, but for the text – and as the Court knows, because it's still sealed, you have the reason why the text was not turned over, and it was not information that would have helped the defense. Other than that, they had everything else that we had. And there is nothing in any of that information or discovery that links Mr. Farias to the criminal offense. Nothing. And it is that absence, I guess – well, I'll get to that in a minute. But essentially, in evaluating the government's willfulness in committing misconduct, I'd like the Court to consider and take under consideration that we had tried to be very accommodating and really were interested in a search for the truth. We were not interested in trying to mislead the jury. Second, the Court should consider the government's willingness to accept responsibility. And I think the Court understands that I am now aware and appreciate that my comments were inappropriate. But the final analysis, when trying to form some sort of remedy, is whether or not the statements likely affected the jury. And in this case, this harmless error analysis applies. And the government submits – One of the mysteries, of course, and this is harmless error in general, but in this particular subarea as well, is that when you have the government invested in a particular evidentiary ruling as it was here, i.e., not letting the paternal be admitted, and yet being of sufficient importance to the jury to emphasize that the cooperation period ended earlier. It obviously has some importance in that nobody would have been, A, fighting about fairness and, B, making the comments. And so then we do this retrospective harmless error analysis, which doesn't aid, it seems to me, in the goal of preventing this sort of double role of the government of keeping out evidence and then commenting contrary to what would have come in. So I guess what I'm saying is I would be – I would take a fairly high standard of harmless error in a circumstance like this. Well, and, Your Honor, I guess the Court's interest in making sure that these statements don't happen in the future, I can understand why there would be an interest in placing – well, and I understand the Court's position on this. I just think that you have to – you can't blanket say once a prosecutor has made a misstatement in closing an argument, that automatically means that error has been committed to the extent that it's not harmless, and so we're going to have an automatic reversal. I think you still have to go through the analysis and determine whether or not in this case the statements in any way affected the jury, you know. And what you look at is, was this case a closed case? And the government submits that it absolutely was not a closed case. How long did the jury deliberate? In this case, it was a two-day trial, and the jury deliberated for two hours. The problems with the setup and the fact that this case wasn't closed was enumerated in great detail in closing argument. The focus on the stale motive, my inappropriate references to those, were two statements, and it was a very small – it wasn't even something that I spent a lot of time on. It wasn't something I had even intended to spend time on. It was something that came out during the rebuttal. And when you look at the amount of evidence that was compiled against the defendant, the other evidence that was unchallenged, the fact that we had an eyewitness who sold the car to the defendant, the fact that we have the September 20th text outlook linking the defendant to a car manufacturer while the car was in his possession, the circumstances of the actual arrest, which are absolutely inconsistent with the notion of a setup, the fact that the defendant himself testified and had the opportunity to be cross-examined, and his credibility did not hold up under cross-examination, I mean, this defendant was not challenged so much on the issue of his motive. But really, when you look at the cross-examination of him, that area was pretty much left untouched. His credibility failed when it came to his explanation of his whereabouts, how he purchased the car, the circumstances under which he received that vehicle, and his lack of knowledge of the modifications in the crossing. The government did not really attack motive. And when it comes to looking at what the evidence that was excluded would bring to this defense, it really only goes to motive. Everything that he is trying, that the defendant is trying to admit is evidenced by their own admission in their own moving papers in their opening brief is evidence that supports motive. They want to bring in that he cooperated against Ferrius. It goes to motive. That he was deposed in 1999 goes to motive. The 1999 deposition related to a million-dollar forfeiture proceeding goes to motive. That the defendant's name was disclosed during the proceeding goes to motive. The testimony of the DEA agent during the cooperation period, again, goes to motive. Testimony from the Attorney General's office regarding the forfeiture goes to motive. And then finally, the testimony that the defendant said he had received threats up through the spring of 2001. Again, by the defense's own characterization in their opening brief at page 21, as well as in the excerpt of record at page 339, the defense is characterizing the evidence as motive evidence. And one, we had, you know, motive is not sufficient. No matter how much motive information you have and you can compile about Mr. Ferrius, it was never going to provide the required links that we see needed in third-party culpability cases. Now, I will admit that the Vallejo case, the decision in Vallejo made more evidence relevant when it related to third-party culpability. It was a more of a permissive approach to finding evidence relevant. But it was not something that gave a defendant carte blanche to argue a defense. It did not get rid of the Federal rules of evidence with respect to issues of relevancy, issues of fairness, issues of reliability. None of the evidence that the defendant is asking to admit links Ferrius to the load vehicle. It does not link Ferrius to the compartment manufacturer that was subject to the text lookout. It doesn't link Mr. Ferrius to Tony, the individual the defendant said sold him the vehicle. It doesn't link Ferrius to the cocaine seized. There is absolutely no link between the circumstances of the defendant's arrest and Mr. Ferrius. Circumstances, you know, that are common and similar in other cases, like Vallejo and in Crosby, both cases cited in the briefs, those were links that were found to be circumstantial evidence that were sufficient to admit the evidence. There's also no appreciable link in the timing between Mr. Ferrius and the defendant's arrest. Even if we bring in the evidence of the 1999 deposition, that's still two years out from the date of the actual criminal conduct. And the government would submit that even if that had come in, we would still be arguing that this motive was fail and that it is not temporarily in close enough proximity to the arrest for it to be considered a link. Vallejo has some very strong facts linking up that third party to the actual criminal offense. That third party was the owner of the load vehicle, previous owner of the load vehicle. That third party had been arrested just a month before for a very similar offense under very similar facts. And we don't have anything close to that in this situation, in this case. What we have is an abundance of information about motive. And I would like to draw an analogy maybe to the duress defense, which is another example of where courts have limited a defendant's ability to present evidence about a defense. You know, it's not just that the defense can raise anything that's fantastical. It has to be fantastical and relevant. And in duress, if it's not relevant, it doesn't come in. And you can have a ton of evidence that somebody felt fear from an organization, but if you don't meet the other requirements, that defendant's not going to be able to testify as to that. And the same is true here. We have a lot of evidence about motive that could have come in, but it was excluded because there was absolutely no link. So you do the balancing test. What was the government interest in excluding this evidence? Did we have a valid and legitimate interest? And the government's response to that is yes, because it was going to be extremely confusing and misleading to the jury. I mean, the truth be told, I don't think that's true. But harmless. Pardon me, Your Honor? But harmless, i.e., it wouldn't have been a problem to the jury. I mean, that's the contradiction, of course. I don't follow. In other words, your argument is that it was really – it wouldn't have influenced anything. It wouldn't have – it would not have influenced anything because there was such overwhelming evidence. But it could have misled the jury and confused them to the extent that they would have spent a lot of time hearing about a lot of evidence that was very tangential and collateral to the issues that were critical to their determination of guilt or innocent. We would have gotten into a lot of information and haggling over the extent of the defendant's cooperation. We would have haggled over the actual impact of that. And we're not talking about cooperation that's relevant in time. We're talking about events and investigative events that occurred back in 93 to 1995 and then again in 1999. You know, there would be a whole bunch of conflict over the issue of the deposition and the impact of that. Whether Mr. Farias was still involved in an organization, what kind of capabilities that organization had, whether – you know, why did he default on that $1 million? That would be speculation. But I'm sure all of that would be issues that would be presented before the jury, and they would be forced to have to parse that out, basically, and separate that from the overwhelming evidence of guilt. And it is the government's belief that the overwhelming evidence of guilt would prevail, but that it really would have been, well, I hesitate to say a waste of time because a relevant defense and relevant evidence, no matter how long it is, should always be admitted. But in this case, the probative value was so insufficient, it did not outweigh the potential for misleading the jury. And I don't think that it's necessarily mutually exclusive. I think we can suggest that all of this extra evidence would have led to some confusion, but still find that because of the overwhelming evidence, the error was harmless. And I would like to elaborate, if I may, on what this evidence was, just to direct the Court's attention to why, in fact, if they find, if you find, Your Honors, that the Court was committed error in excluding the evidence, when you ask yourself whether or not any of that affected the jury's decision, consider the jury's decision to exclude the evidence.   It's the jury's decision to exclude the evidence. And so we have the following. You have an eyewitness who identified the defendant and said he sold the defendant the truck on August 20th of 2001. And I have specifics, and I can cite to the record about all the information that this particular person gave during his direct and cross-examination. But he was challenged on cross-examination to his identification of the defendant, and he survived that challenge. We have the text that was entered on September 20th connecting the truck and the defendant to the investigation of a compartment manufacturer, and this is after Mr. Cuevas had bought the truck. We have the quantity and the type of drugs involved here, 23 kilos of 92 percent pure cocaine. Now, the street value in Mexico is about $120,000. The street, I mean, excuse me, the wholesale value in Mexico is $126,000. The wholesale value in San Diego is almost $300,000. And the street value is $900,000. When it comes to value, though, I think the defense counsel is suggesting that depending upon where Farias fell within a certain organization, that would determine how much impact that financial loss had on him. But the truth is, we don't know anything about where Mr. Farias fell in an organization, or even if he was still in a drug organization. We have no information about Mr. Farias after 1999 when he defaulted on the forfeiture action. So we really can't speculate as to what his loss was. All we can do is tell the jury how much this cocaine was valued at. You also consider the fact that the expert testimony was that drug smuggling is only – is successful 90 percent of the time. Only 10 percent of the load vehicles are caught. And so why would they choose a method of trying to, you know, why wouldn't they have done a situation where there would have been an issue involving distribution maybe farther down the road where they can contact law enforcement and, you know, have Mr. Cuevas found in a vehicle with it – with the drugs without having to go through the rigmarole of hoping that a dog sniffs the vehicle and is able to, you know, alert them so that there is a follow-on inspection and that they're able to locate the drugs. The nature of the concealment also supports knowledge. The testimony is lengthy. There's over 27 government exhibits of photographs related to the truck and the looks of the truck. Almost every aspect of that vehicle was modified in some way. That is a very – you know, although the process itself may not have been the most difficult mechanically, it was one that was – that pervasively affected the truck, and certainly there were much simpler ways to try to set up somebody without having to use something with such extensive modifications. Finally, the defendant, as I mentioned before, testified and was just found not to be credible. He's apparently bought this truck from an individual named Tony, that this Tony person let him borrow his truck for a period of time, that for over two years this defendant just happened to accidentally bump into Tony, yet he didn't know Tony's name, he didn't know Tony's phone number, he didn't know Tony's address, he didn't know anything about Tony, yet Tony seemed fine letting this defendant drive the truck around. Apparently, Tony was going to have the omniscience to know that Mr. Cuevas would want to buy the truck. If Tony was the one that purchased the truck in August, how was he supposed to know in November that Mr. Cuevas was in fact going to be interested in buying it, especially given the testimony that Mr. Cuevas had three other vehicles? He did not need the truck. And when you read the testimony, if you look and read the testimony, how he was cross-examined, his demeanor even pops off of the page in the transcript. He's not credible. The defendant worked in body shops since 1975. He owned, well, it's written in the government's briefs. It goes on and on. And the government's final analysis is, even if you find that the evidence that was excluded should have been admitted, that this was not a miscarriage of justice, because the jury would have held the same. But the evidence was too great and the defense was too attenuated. Even with the evidence, more evidence about motive coming in, it was too attenuated for them to have changed their verdict. And I'm out of time. Thank you. Thank you all. Appreciate your candor. Yes, sir. My remaining time, I think, I have 4 minutes and 21 seconds. Just to make a couple of points. First of all, the argument that was just made by government counsel is a fine argument to a jury, assuming both sides have equal access to putting on their side of the evidence and let the jury decide. Government counsel suggests that the jury would have been confused on whether or not to have any evidence, and I suggest that that's a euphemism for they might have found a reasonable doubt in the evidence if we compare a couple of things. It's one thing for a defendant to say, I drove across the border with a truck. I didn't know it had anything in it. And I was an informant in 1995, and some people knew it. That's what the jury heard. It's another thing to say, I was an informant in 1995 and I was subpoenaed in and had to give information on a deposition on an asset forfeiture of a million dollars for a particular person. That person found out about it. And in terms of connecting that person as having found out about it, that was easy. Number one, the threats came shortly after the deposition was rendered. Secondly, the defendant is the one who knew the threats were coming in and from whom they came in. And so lining up the fact that the deposition against that person and the asset forfeiture and who the threats came in from, that would have made that entirely clear and relevant. But there's another aspect of this which I think is lost in the shuffle of the rhetoric. And it's a practical matter. And it's a practical matter for a jury more than any other body to look at with proper evidence. And it's this. If the Court was asking us, and this Court seems to be asking us, what was our direct link to Miguel Farias and his organization and this particular incident? One, that's you're not going to get somebody to be able to testify to that. But who else, in part, is the question? If the defendant is going to testify that I didn't know the stuff was there, but I've been an informant and there were people that were mad at me, okay, most people wouldn't be in a position to point out to somebody who, number one, had a motive to get even with him, and number two, had the capacity to do that, and to have the capacity to do that without taking great risks or great losses themselves. And who would fit that bill? And that would be Miguel Farias and or his organization. And that's where it becomes a strong circumstantial link that was not presented to the jury. That's why everything fell flat. And so the defendant could have testified that, yes, there was somebody who had a motive and, yes, that's the kind of person who had capacity, and the expert witness, Jacobs, was in a position to testify that, yes, there is a Miguel Farias organization and probably could have testified it's still operating or it's not still operating based on his knowledge of that area. But that's what we were also restricted from presenting in terms of putting in the prerogative elements. The other aspect of it is government counsel argues the percentage likelihood that the car would have been stopped and there would have been a seizure at all. Why would somebody put it at risk that way under those circumstances where there's this good secret compartment? And the answer to that, in part, is why would somebody go to all the trouble of making a secret compartment that is that carefully constructed and leave one of the kilos out where it can be observed by a government counsel who didn't even have a dog's nose and, therefore, wasn't using, like, canine capacities to find it and simply found it on his own some months after the event? I assume there are other possible explanations such as it wasn't left out. It was just taken out from where the other drugs were and somehow never collected up to be taken away. The examination into that area, for the most part, precluded those other possibilities. We really went and delved into it at some length. And it was extremely unlikely that it could have fallen out and landed where it was found. It just, it was like a virtual impossibility by the logistics of it. It had to have been left out and been there almost certainly before the car crossed the border. The others, and the other thing I'd like to point out in that regard is, again, posing that question, the Court is, in essence, posing why it is that this really all should have been a jury question. And it should have been a jury question with full evidence in front of the jury. One other point, by the way, I have gone back and double-checked the record in terms of the government counsel's argument relating to the stoppage in 1995. And government counsel went to some lengths to point out the effect of that and said, and from that you're supposed to find that there is a reasonable doubt. Well, we don't have the links, we don't have the evidence, and we don't have anything to suggest that the people that were involved with the load, that put the load in this vehicle, wanted to retaliate against Mr. Cuevas. Why would they do it six years later? Why would they do it and lose $100,000? Putting some real emphasis on that. And the Court, when ruling on it, basically ruled, and there was some comments by the Court when the Court ruled on our request for some sort of a corrective instruction, and the Court said, I excluded the stuff after 1995, and that was basically the rationale for not giving any further explanation to the jury. At least that's the way I read the Court's comments. With that, I'm prepared to submit. Very well. Thank you very much. And the matter will be submitted, and we'll now move on to the next item.
judges: Pregerson, Fernandez, Berzon